All right, our next case for argument is 24-1798 Parallax Group International v. Incstores Do you mind if I just get a glass of water? Oh, please go ahead. It's dehydrated and ready. Thank you. May it please the Court, my name is Matthew Peckinaw. I represent Incstores, the appellant in this litigation. Incstores brings this appeal today, presenting multiple discrete areas involving two different Parallax patents, each with serious public policy considerations. First public policy issue raised is the public notice function of a patent. The idea that the patent is supposed to tell the public what the actual invention is, and then at the end of the patent term the public will know that they can practice that invention because it's dedicated to the public. As to the 085 utility patent, which involves that public notice function, the issue the district court allowed Parallax to redefine its invention in litigation in a way that conflicts with the 085's patent disclosure, and Incstores contends that that approach undermines the patent system's public notice function. The 085 patent claims an invention that solves the purported prior delamination problem related to dual color formats using coefficient of thermal expansion matching, abbreviated CT in case I see CT later on here. So CT matching and undulations for the purpose of preventing two layers of a mat from separating from each other in delamination. During the course of the litigation for the next year and a half, Parallax reinforced the narrative, including in e-mails between counsel, such as in June of 2016 where Parallax stated that the undulations were intentionally done, suggesting to me, the recipient of that e-mail, that they were to prevent or reduce delamination. Likewise, at a different point in the litigation, just as another singular example, the named inventor, Mr. Thrush, executed a declaration stating that he had developed techniques to match coefficient of thermal expansion when he was defending validity of the late patent opposing summary judgment. Around two weeks later in 2018, when Mr. Thrush was deposed, Thrush testified that he did not know that dual color mats existed before he made them, never observed delamination, didn't care about CT, and had never tested for it, and he testified that undulations were ornamental defects that he basically included in the claims because he knew that that feature would end up in products in the marketplace. Is your argument right now geared towards trying to explain to us why the district court committed clear error in not finding inequitable conduct? With respect to this issue, I think there was some confusion with the district court as well, but we had raised it both in the inequitable conduct sense and the exceptional case sense as an alternative. Okay. So I'm raising it in both contexts, actually. Okay. Because I didn't quite understand how everything you're talking about with respect to the 085 patent and whatever it was testified to, how that connects with some allegation that the applicant committed inequitable conduct before the patent office. For example, he signed a declaration saying that the specification, you know, the background of the invention, the summary of the invention, the claims, that that was his invention. At the end of the litigation, he testified that his invention was not using or creating undulations to prevent delamination, but it was to control undulations which already existed in the prior art, which were too wild, and he wanted to reduce them for ornamental reasons. Because of that disconnect, our argument on the inequitable conduct issue in particular was that effectively he signed a declaration for patent disclosure, which he didn't really invent, and he must have known it had he read it. And effectively, it was a sham patent, sham patent on the patent office. And then separately, because of those same and similar issues, and also involving the representations of parallax during discovery and things like that, it supports an exceptional case because, in effect, the entire litigation is meritless with respect to HVAC. So that would be the exceptional case. But district court action was stayed during the pendency of the re-exams? At least at some point during the re-exams, the district court action got stayed, right? Yes. Summa sponte, at the very end of litigation, after the parties had already spent the entire, you know, litigation preparing for trial and discovery closed and all that, we'd actually requested early on that a stay be granted based on the re-examinations. Another party who was co-litigating the same issue actually got a stay. Judge Guilford denied our stay. We actually had essentially the same stay motion on file, actually, because of co-defense agreement. But anyway, and later, when parallax amended the claims, effectively mooting any damages, in our view, narrowed the claims. And once you narrow the claims, that's supposed to wipe out any past damages. We had asked for another stay based on that because, at that point, 764 was already invalidated. 238 had been withdrawn because parallax had admitted that none of the original allegations had merit with respect to 238. And so 085 had been amended. And again, because we thought that that wiped out all damages, that that was a good time to ask Judge Guilford a second time for a stay. He denied it again. So after that, the parties progressed through discovery. Bruce Thrush, the inventor, was actually deposed. He didn't show up to his first deposition. So when he actually did show up, it was at the end of discovery or maybe even after they're closed. You know, I think Judge Guilford had given leave or something like that. But it was at that point that the parties had filed new cross motions for summary judgment. And also, I believe there was a motion for leave to amend the complaint with respect to inequitable conduct allegations because of current activity that was going on during the reexams. Judge Guilford decided that that was too much, there was too much going on. Okay. I guess to bring back, you know, the discussion to the arguments in front of us, you know, I think the big problem we have here is that there's a very deferential standard of review here to the district court judge who, when you look at his trial decision and then his denial of your motion to amend it, it really does look like the judge carefully considered a whole multitude of different arguments and issues. And each of those findings, it gets a lot of deference. And so you've got quite a mountain to climb to try to convince this court that something really unreasonable happened below. What is your best argument? Well, I would say our best argument, well, first of all, it definitely appears superficially that he gave attention to the subject matter or briefs and things like that. But I think we've exposed a lot of underlying mistakes in the reasoning and things like that. But I think our best argument is with respect to 08-5 and this concept that Paradox kept switching positions back and forth, you know, taking a narrow stance with respect to the claims when it came to defending validity at the Patent Office. You know, for example, during reexamination, it was arguing at the Patent Office that it was very difficult to match CTE, that if you had two layers, a top and bottom layer that were the same composition, they were arguing to the Patent Office to say validity during reexamination, that that wasn't enough to establish coefficient of thermal expansion. But then on the flip side of that, they were accusing my client's products after having performed no testing, just basically looking at photographs and noting that both were EVA foam or something like that. And I think it's even reflected in their infringement contentions that are cited. But lots of other issues. You know, Thrush, again, I think he admitted in his deposition in 2018 that two weeks prior, he had submitted a declaration also talking about difficulty of CTE and things like that, where he said that, I'll just read it, that his invention was solving a problem that was plaguing the industry with respect to dual color mattes, and that, you know, his efforts with CTE and undulations resolved that problem, and that's why he got the patent. And that's the declaration, again, he put in, filed with the court, opposing summary judgment. But then two weeks later, he testified, I've never even seen dual color mattes before, didn't know about delamination, didn't care about CTE, thought that using top and bottom layers of the same composition was common sense, and you would always, in those circumstances, get a matching CTE. When asked why he had made that declaration and whether he believed it was accurate, he agreed that it was inaccurate, and he could not explain how he would change it to make it accurate at that time. Counsel, if I could.  The history of this is littered with concerning twists and turns, and you've outlined all those.  And you go back to, you know, the number of claims that were withdrawn based just on the threat of a Rule 11 motion and the rest. Like Judge Chen, my concern here is the standard review hurdle that you have and what exactly the district court either missed or got wrong that makes it clear error for this court to, where this court needs to address it. I understand completely. I think what Judge Sona did was he looked at all these inconsistencies, and he ultimately determined by looking at the 085 patent itself that it was reasonable for Thrush to contend that his invention was controlling undulations as opposing to using undulations anew or CTE anew to prevent delamination. However, when you look at the patent itself, and I think at least to some extent the Court can review the claims de novo, I realize that overall there's an abuse of discretion standard. I think the Supreme Court case on the issue actually suggests that still there might be some issues of law that factor into that, and I think that's the claim construction itself. Counsel, you're almost out of time. Would you like to save some for rebuttal? Sure. So this is correct, right? I'll finish answering. I'm sorry. Was that set at 15 minutes, Mike? Two minutes of 15?  I'm sorry. I thought it was set to eight.  I'll take your time. Okay. No problem.  Thank you, Chief Judge Moore, and may it please the Court. I'm John Day-Lewinsales. I represent Parallax in this case, as I have for the last nine years or so, and I want to, I think, bring up critical points that underlie Judge Chen's question and Judge Cleese's as well, and that is that we're here because Judge Selma denied Ink Store's exceptional case motion, and that exceptional case motion depended almost entirely, maybe 90 percent, on the allegations of inequitable conduct. So if we look at the inequitable conduct side first, and Judge Selma's resolution of that counterclaim, it's important to remember that Judge Selma conducted a bench trial on the counterclaim, and Ink Store's had the opportunity to and did question Mr. Thrush, the named inventor, as well as Mr. Thrush and Mr. Andelin, who were the prosecuting attorneys. They were able to put on their own expert as to part of their inequitable conduct story, and then the parties did a post-trial brief, and Judge Selma then provided very detailed findings of fact and conclusions of law that came out of that, and the real gist of the Ink Store's appeal is that they don't agree with what Judge Selma, how he resolved those key factual issues. And in each case, with respect to Mr. Thrush, Mr. Andelin, and Mr. Fish, the individuals who were accused of inequitable conduct, Judge Selma specifically found that each of them testified credibly, that they did not intend at any point to mislead or deceive the PTS. Well, I mean, I think that it's fair for Judge Selma to have concluded that Fish did not mean or intend to deceive the PTO and probably didn't deceive the PTO. When he made the statement, the applicant knows of no prior art interlocking masks that have multiple layers, which are either textured on both sides or where the layers have different colors. I see no problem with the statement or the finding by the judge that at the time Mr. Fish made that statement, he did not intend to deceive the PTO. In fact, it may very well have been a completely and utterly true statement that at that moment, when he made that statement, he didn't know of any prior art. But isn't there a continuing obligation to notify the PTO if you've made an assertion that you later find out to be untrue? Okay, it is true he did not know of the prior art at the time he made the statement, but later on he finds out through the prosecution process related to the other applications that there are one or two pieces of prior art that fall into the category of the things he said he didn't think existed. Doesn't he have an obligation? I mean, wouldn't a sort of good attorney either notify the PTO and say, you know, these have been brought to my attention, I just want to correct the record, apparently these exist, or alternatively, you don't want to correct the record, just submit them in an RCE. I mean, isn't that what we normally do in this kind of thing? You just continue in prosecution and you actually submit those two documents so that, you know, the statement he made was not false when he made it. But isn't it reasonable to expect there's a continuing obligation of candor to the office which ought to include correcting something you later find out to be incorrect? Well, I agree with the second part of Your Honor's statement. I believe that if Mr. Fish became aware that his statement was incorrect, that if there were facts that he needed to make the patent office aware of, that he should have done that. But in this case, I don't believe that that is what happened. I think that that statement by Mr. Fish in his declaration had a temporal element to it. So what he said was, what the actual statement is, is that at this time, the applicant knows of no such prior argument. And that so the only way to assure that that statement Well, he didn't say the at this time thing. He didn't say at this time. Well, he did say the appellant knows of no. So I believe that there is a temporal element that is a part of that statement. Just to follow up on the Chief Judge's question, then there is no question that Mr. Fish learned about dual colored mats soon thereafter while this particular design application was still pending before the office. So therefore, wasn't there an obligation at that time, once he learned about Dilazansky, once he learned about Chang, to submit Chang and Dilazansky to the design patent examiner and say, okay, I told you last year that I was unaware of any such dual colored mats. Well, it turns out they do exist here too that I've learned of. But let me tell you why they are of no moment to the patentability of my design. And I would not dispute that that would have been a better practice. But the next question is, was there an obligation for him to do that? Well, no. Why not? Well, there would not be an obligation for him to do it in order to avoid a finding of inequitable conduct. That's what I'm saying. Because what both of your honest questions go to, I think, is toward the materiality of the statement, the materiality of that bit of information. It's actually more towards the officer of the court kind of concepts for me. I mean, materiality, by the way, I mean, you don't want me to get to materiality because one of them was part of the ultimate rejection, so you would lose on that one on materiality for me. So you don't want to go to materiality. But on the intent prong, I mean, he's an officer of the PTO, a member of the bar. You have a continuing duty of candor. I mean ---- I don't disagree that it would have been the appropriate thing to do, that he should have done that. But at the same time, Mr. Fish's good faith belief was that those other references were not material. And that was part of Judge Selma's finding in the case. And so do you ---- But do they have to be material or haven't we had cases that say they are in fact material if they directly contradict a statement you made at the PTO? I agree that they are material. I agree they're material. But there's under Fair Sense, there's two sides of or two aspects of the inquiry. One is materiality, and materiality can be but for materiality of a piece of prior art. Or in the case of an affirmative statement that you make to the PTO, it doesn't have to be. It could just be an important piece of information. So I would concede that it's material. And I think even Judge Selma conceded, he said, you know, without even finding one way or another whether it is material, if I assume that it is, I still have to inquire about what was Mr. Fish's specific intent. And there has to be a finding that ---- So can you explain to me, like, do you have any clue? What is your best guess as to why he didn't disclose it? Is it because he sort of just didn't appreciate the relevance of that art somehow, even though it was being cited in the other action? I mean, what is your best guess as to why he would not have disclosed it? I think it's because the art that you're referring to, Duloszanski and Chang, were cited in the utility and not in the design pad. And so he just didn't make the connection. I think it was just an innocent failure to correct versus reflecting any specific intent to deceive, which is what ---- Negligence, not intentionality. Exactly. And what the cases say is that negligence, even gross negligence, isn't enough to establish specific intent to defraud the Patent Office. There has to be something more. There has to be something else. And we did have a trial on it. And Judge Sona heard testimony on the subject of this exact point, and he ultimately came down and said that he found Mr. Fish to be credible. And that he did not believe that he had the specific intent to defraud the PTO. And I believe, based on Rule 52 of the Federal Rules of Procedure and a Supreme Court case called Anderson v. City of Bessemer, that this Court respectfully cannot disturb those credibility determinations. Those are uniquely the trial court's decision. And I'm aware of no case where the Federal Circuit has reversed an inequitable conduct decision where the trial court has specifically found that the inventor and the prosecuting attorneys lack the specific intent to defraud the PTO. I don't see how, based on the record that we have, you could get there. And maybe there is some questioning that ink stores could have put on at trial that would have got at your honest point or your honest point and elicited from Mr. Fish some incriminating reason why he did not disclose it. Maybe, you know, got him to admit that if he disclosed those, there's no way that the signed patent issued. But they didn't do that. And that's not in the record. And we don't have that. All we have is the testimony that they did elicit on cross-examination and ultimately the decision by Judge Stelma that there was no specific intent to defraud. Echoing what the Chief Judge and Judge Kim asked, my concern here is the disclaimer, a temporal disclaimer being able to forego the clear obligation to supplement, that any patent applicant can simply say what the time, which renders this court's body of law on this issue, the PTO's processes and procedures, the duty of candor, as the Chief Judge mentioned, irrelevant. If they are coached, prepped, trained, whatever term you want to use, by their counsel, make sure you put a temporal disclaimer on when you had this belief. And then we'll get together. Well, you know, I didn't mean to suggest that that's what our argument is. But I believe and I accept the idea that Mr. Fish, when he became aware of those references, should have submitted them. I'm not disputing that at all. All I'm saying is that the only evidence in the record was that, or maybe the lack of evidence in the record, reflecting any sort of intent to deceive the PTO into issuing a patent that we're otherwise not entitled to. That just didn't happen. And Judge Selma made that finding, and I don't see how you could, even based on what Your Honor believes is the obligation of prosecuting counsel to bring relevant references to the patent officer's attention, I don't think that you can get there from here. Okay. Anything further, counsel? Well, the only other point that I wanted to make, Your Honor, is that the inequitable conduct claim is, counterclaim is the centerpiece of the exceptional case motion. And Mr. Pecono's arguments about what were essentially the shifting sands view on the 085 patent, I think Judge Selma addressed those and rejected those, but that was really more a part of their argument that he should have granted the exceptional case, even if they lost the inequitable conduct counterclaim. So could you just explain a little bit about this undulation matter? I have to confess I have a hard time following what's going on here, but the overall story arc seems to be the patent says one thing, then Mr. Thrush comes in and says another thing, and then Mr. Thrush has to do a take-back and try to correct what he had said previously. I don't think, Your Honor, respectfully, I don't think that that is exactly what happened here. What Judge Selma found was that Institute took issue with what the patent said versus what his testimony was. And what Judge Selma pointed out in his order was that the patent was not written by Mr. Thrush. The patent was written by his lawyers, and it may well be that you would have a layperson like Mr. Thrush who would use words in a different way than how the legalese of the attorneys put it out there. And Institute also attempted to show that there was a conflict between what the lawyers argued versus what Mr. Thrush testified to. But I don't believe that there was a meaningful change in Mr. Thrush's testimony. And Judge Selma said so. Judge Selma said what happened was, you know, the undulations or microscopic undulations may be an inherent part of this type of a mat, but that doesn't preclude there being an inventive concept associated with controlling the undulations for the specific reason which was to prevent delamination. So I don't believe that they established shifting stands. I don't believe that they established that there was inadequate pre-filing investigation by parallax. And what Judge Selma concluded was, Institutes didn't give me the analysis that I would have to have in order to grant the exceptional case motion if I disagree on the inequitable conduct, that really those two have to rise and fall together. And although they argued something else, the record doesn't support it. Okay. Thank you, counsel. Thank you. Counsel has a little bit of time. I'd like to address the issue of intent first with respect to 764 since that was just discussed. I think, well, number one, Fish absolutely had an ongoing duty, and I don't think that's really disputable that the patent rules require disclosure at any time during the pendency of the patent that you find something material that you're supposed to disclose it. It seemed at one point, at least at appendix page 38, that Judge Selma seemed to not understand that prosecution was still open, and I believe that might have had some sort of effect on his decision with respect to intent to deceive. But even apart from that, Fish testified that he made a conscious decision not to disclose this reference. He also testified that he knew about it. During 764 pendency, he said that despite having told the patent office to allow the patent based on dual color, that he decided to withhold the references, affirmatively withhold them, intentional decision, because the teeth looked a little bit different or something like that. Eventus Farmer, though, says if you know a reference's material, which he obviously did because he told the patent office to allow 764 on that basis, and you make an intentional decision not to disclose, that's intent to deceive, and that's exactly true. The problem here is the district court concluded that he testified credibly that he did not believe they were material to novelty or non-obviousness, and the designs, you know, are similar, but they're still different. In the re-exam, there was a different reference called Wu that was used as the Rosen primary reference. D. Lasansky was used as a secondary reference, but in terms of the overall look and feel and appearance, it was a different reference, not D. Lasansky or Chang. So I guess the question here is, again, maybe this wasn't a model of ideal patent prosecution and probably should have filed the IDS with these two references, but nevertheless the district court looked at Mr. Fish while he was testimony and concluded that he did not have an intent to deceive because he didn't think these references looked close enough to his claim design. And so therefore, it's hard for us to go over the top on that. Got it. I thought I had run out of time. You have. Okay. All of a sudden, my time shut up. Do you want me to answer or address or am I? You can respond to Judge Chang. Go ahead. We'll call on him back. Okay. I'll just say, I think Judge Selna, it is a matter of law deciding that the reference was not material. The references were not material because I think the case law says that when you tell the patent office to allow something based on a particular feature, it's automatically material. I think it also falls into the Feruson's exception of a false declaration, and then he also failed under Roman Haas in Intellect Wireless to correct his false statement. Both of those cases require, and neither of those cases necessitate that the false statement have been made intentionally when it was made. They just say, generally speaking, there are these steps you're supposed to follow when you make a false statement, and it's unquestionable that Mr. Fish did not do that. Okay. I thank both counsel. This case was taken under submission.